IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WHEATON EQUIPMENT CO., an Idaho Corporation, | ) ) ) | Case No.  CV-03-220-S-BLW |
| Plaintiff, | ) ) | **FINDINGS OF FACT AND** **CONCLUSIONS OF LAW** |
| v. | ) ) | |
| FRANMAR, INC., a Corporation; and  FRANKLIN TOLBERT, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**INTRODUCTION**

Wheaton Equipment Co. ("Wheaton") and Franmar, Inc. ("Franmar")

entered into a joint venture ("Joint Venture") for the primary purpose of buying

and reselling certain mining equipment.  Each party incurred expenses and

received income on behalf of the Joint Venture, but each party disagreed with the

other party's accounting of its income and expenses.  The parties failed to reconcile

their dispute, and Wheaton filed suit against Franmar and it's sole shareholder,

Franklin Tolbert, alleging breach of contract and seeking a proper accounting of

the profits and losses of the Joint Venture.  Franmar counterclaimed, alleging

breach of contract and seeking an accounting as well.  Franmar also added

**Findings of Fact and Conclusions of Law - 1**

additional claims under several other related legal theories.

The Court held a court trial during the week of December 12, 2005.  After hearing the testimony and reviewing the exhibits, the Court finds that both Wheaton and Franmar breached the contract to some degree, and that both parties failed to provide the other party with a proper accounting of its profits and losses incurred on behalf of the Joint Venture.  The Court finds that Wheaton shall have Judgment against Franmar in the amount of $340,186.32, and Franmar shall have Judgment against Wheaton in the amount of $12,245.89.  The Court issues the following Findings of Fact and Conclusions of Law explaining its reasoning.

## FINDINGS OF FACT

### A.      General Observations of Trial Testimony

1.      At the outset, the Court will note that the lion's share of the testimony at trial came from Wheaton's sole shareholder, Larry Wheaton ("Mr. Wheaton"), and Franmar's sole shareholder, Franklin Tolbert ("Mr. Tolbert").

2.      The Court notes that it found the testimony of both Mr. Wheaton and Mr. Tolbert credible.  Therefore, the findings stated in these Findings of Fact are based less on credibility, and more on a reasoned consideration of the effect of their testimony.

3.      Unfortunately, this is a case where the parties may have benefitted from a

more formal, written agreement, instead of their less formal, oral agreement; not because one party tried to take advantage of the other, but because of basic misunderstandings between them as to what their agreement was and the legal effect of their relationship.

**B.    Parties**

4.    Plaintiff Wheaton is a closely held Idaho corporation that sells and leases mine and heavy equipment.  Mr. Wheaton is the sole shareholder and President of Wheaton.

5.    Defendant Franmar is a closely held Colorado corporation, which acts as a broker in the sale of used equipment in the mining industry.

6.    Defendant Franklin Tolbert is a citizen of the State of Colorado.  Mr. Tolbert is the sole shareholder and President of Franmar.

**C.    CAT 777C Trucks and CAT D9N Bulldozer**

7.    In 1999, Wheaton purchased a mining fleet from the Beartrack Mine ("Mine") in Salmon, Idaho.  The fleet included, among other equipment, three CAT 777C trucks and a CAT D9N bulldozer.  After leasing the fleet back to the Mine for a year, Wheaton put the fleet up for sale.

8.    In September 2000, Mr. Tolbert and representatives of Texas Industries ("TXI") met with Mr. Wheaton at the Wheaton equipment yard in Boise,

**Findings of Fact and Conclusions of Law - 3**

Idaho.  TXI was interested in purchasing the three CAT 777C trucks for its

upcoming rock crushing operation in Mill Creek, Oklahoma.  While at the

equipment yard, the TXI representatives also became interested in the CAT

D9N bulldozer.

9.      Ultimately, Wheaton sold the three trucks and the bulldozer to Franmar for

$990,000.00, plus a freight charge of $42,880.  Franmar, in turn, sold the

items to TXI for $1,032,880.00, which yielded Franmar a $12,120.00

commission. (Ex. 1032).  Franmar's commission was less than the $55,000

he wanted for the deal.

10.     Franmar contends that by the time TXI purchased the trucks and bulldozer

from Franmar, Wheaton and Franmar had formed the Joint Venture.

Franmar therefore argues that the trucks/bulldozer deal was part of the Joint

Venture between Franmar and Wheaton and that Wheaton is required to

share his profits from the deal with Franmar.  The Court disagrees.

11.     Wheaton had already purchased the trucks and bulldozer from the Mine

prior to contemplating the Joint Venture with Franmar.  After Wheaton

purchased the trucks and bulldozer, TXI representatives went to Wheaton's

yard, with Mr. Tolbert as a broker, and the parties agreed on a price that

yielded Mr. Franmar a commission.  Moreover, during their discussions

**Findings of Fact and Conclusions of Law - 4**

about a joint venture, the parties agreed to provide Franmar with $42,880.00 from the Joint Venture to make up for his low commission on the trucks/bulldozer deal.[1]  This information reflects the parties' understanding that the trucks/bulldozer deal was separate from the Joint Venture.

12.     The Court therefore finds that the trucks/bulldozer deal was not part of the Joint Venture, except to the extent that Franmar would receive the first $42,880.00 from the proceeds of the Joint Venture to make up for his low commission on the trucks/bulldozer deal.

**D.     Formation of Joint Venture**

13.     During the September 2000 negotiation of the trucks/bulldozer deal, the TXI representatives also made it known to Wheaton and Franmar that TXI was interested in purchasing the Mine's crushing plant.

14.     Over the next couple of months, Franmar and Wheaton discussed and orally agreed to form the Joint Venture.  Although the parties had been involved in other joint ventures, they had never participated in a joint venture with each other.

---

[1]  At first blush, it would appear odd that Wheaton would agree that Franmar should receive additional funds from their joint venture to make up for a small commission he had made in an earlier transaction.  However, it appears that the parties are engaged in a trade where trust and long-term relationships are more  important than the profits generated from a single transaction.

**Findings of Fact and Conclusions of Law - 5**

15.   Mr. Wheaton testified that he had been involved in at least ten, but less than

thirty joint ventures in the past twenty years.  He stated that under all of his

previous joint ventures, one of the parties would purchase the assets, manage

them and then resale them.  Upon sale of the assets, the selling party would

recoup his direct costs and split the remaining profits with the other joint

venturer.  He testified that he has never included general overhead expenses

in a joint venture.

16.   Mr. Tolbert testified that he does joint ventures on nearly a daily basis

without written agreements.  He testified that the parties to this Joint Venture

agreed to split the net profits.  Mr. Tolbert stated, however, that there was

never any discussion or specific agreement that general overhead expenses

would be included in the net income calculations.  Mr. Tolbert testified that

he decided to include administrative and general overhead expenses in his

calculation of Joint Venture expenses when his accountant advised him to do

so.

17.   The Court finds that the parties orally created the Joint Venture between

Wheaton and Franmar.  The Court further finds that under the terms of the

Joint Venture, the parties were to split the net profits equally, except that

Franmar was to receive the first $42,880.00 of profit to make up for his low

commission on the trucks/bulldozer deal.

18.     The Court also finds that the parties' agreement envisioned that they would

        consider direct costs, but not general administrative costs, in determining the

        net profits of the Joint Venture.  (See Conclusions of Law below for the

        legal analysis related to this finding).

19.     The main purpose of the Joint Venture was to purchase the crushing plant

        from the Mine, and resell it to TXI.

20.     Between September and November 2000, Mr. Wheaton negotiated the

        purchase price of the crushing plant with the Mine, and Mr. Tolbert

        negotiated the selling price of the crushing plant to TXI.

**E.     Joint Venture Transactions**

21.     The final deal between Wheaton and the Mine included more than just the

        purchase of the crushing plant.

22.     During Mr. Wheaton's negotiations with the Mine, Joe Woods, the Site

        Manager of the Mine, offered Wheaton a "package deal."  Mr. Wheaton

        relayed that information to Mr. Tolbert.

23.     Mr. Wheaton and Mr. Tolbert believed that the "package deal" would yield a

        profit to the Joint Venture, so they were inclined to accept the deal.

24.     Wheaton soon became aware that the total purchase price for the "package

**Findings of Fact and Conclusions of Law - 7**

deal" would be $1,750,000.00.  However, Wheaton would not commit to the deal until he had a committed buyer for the crushing plant.

25.   During this same time-frame, Franmar worked on the deal with TXI.  During negotiations, Franmar learned that in addition to purchasing the crushing plant, TXI wanted the crushing plant on a turnkey basis.  TXI wanted Franmar to disassemble, transport and reassemble the crushing plant at its Oklahoma site.  Franmar ultimately agreed to the deal, which included both a purchase contract and a construction contract for the turnkey operation.

26.   The final Purchase Agreement between Franmar and TXI for the crushing plant and related equipment was Dated March 5, 2001, with a total purchase price of $1,970,000.00.  (Ex. 1034).

27.   The final Construction Contract for the turnkey operation between Franmar and TXI was dated March 7, 2001, with a total price of $1,300,000.00. (Ex. 1033).

28.   With a buyer in place, Wheaton finalized the deal with the Mine.  The final sale of the "package deal" was evidenced by more than one bill of sale.

29.   A bill of sale for the crushing plant and related equipment from the Mine to Wheaton was Dated March 20, 2001, with a total purchase price of $1,650,000.00.  (Ex. 1005).

**Findings of Fact and Conclusions of Law - 8**

30.    A separate bill of sale for a Link Belt Crane, three buildings and their

contents was also dated March 20, 2001, with a total purchase price of

$100,000.00. (Ex. 1002).

31.    A third bill of sale for the purchase of four light plants, a compressor, a

blasthole drill, three welders, and a forklift was dated March 26, 2001, with

a total purchase price of $45,000.00. (Ex. 1024).[2]

**F.    The $45K Transaction**

32.    Wheaton testified that the $45,000.00 transaction was not part of the Joint

Venture.  Franmar claims that it was part of the "package deal" and therefore

part of the Joint Venture.

33.    The Court finds that the $45,000.00 transaction was part of the Joint

Venture.  Even if Wheaton believed at the time it entered into the contract

that it was not part of the deal, Mr. Wheaton led Mr. Tolbert to believe

otherwise.  At the very least, Mr. Wheaton relayed ambiguous information to

Mr. Tolbert by referring to the deal as a "package deal."  Moreover,

Wheaton was the party responsible for negotiating with the Mine on behalf

of the Joint Venture, and Wheaton was responsible for clarifying any

---

[2]   The inventory also included a "Big Joe," which the parties agree was not part of the $45,000.00 purchase.

**Findings of Fact and Conclusions of Law - 9**

ambiguities.  Furthermore, the closeness in time of the $45,000.00

transaction with the other Joint Venture transactions suggests that they were

all part of the Joint Venture.

**G.    Separate Obligations by the Parties**

34.    Wheaton and Franmar each had separate obligations under the Joint Venture.

Franmar was responsible for the tear-down, transportation, and reassembly

of the crushing plant on a turnkey basis at TXI's facility in Oklahoma.  This

was the first turnkey operation ever performed by Franmar.

35.    Wheaton was responsible for the removal and resale of all the remaining

equipment, buildings, and contents of the buildings located at the Mine.

**H.    Franmar's Obligations**

36.    During negotiations with the Mine, Mr. Tolbert, Mr. Wheaton,

representatives of TXI and Bob Fratti from Sawtooth Engine and Aircraft

("Sawtooth") met with Joe Woods at the Mine.  At that time, Franmar hired

Sawtooth as a subcontractor for the purpose of disassembling the crushing

plant at the Mine and reassembling it at TXI's facility in Oklahoma.

37.    In March, 2001, Sawtooth began disassembling the crushing plant.  When

the crushing plant was shipped to Oklahoma, the operation ran into weather

caused delays.  Rain had washed out a bridge that was necessary to transport

**Findings of Fact and Conclusions of Law - 10**

the pieces to the staging area of the turnkey operation.  Rain had also

damaged the staging area.  Ultimately, the turnkey operation took fifteen

months to complete instead of the anticipated six months.

38.   During this process, and in the context of its duties to the Joint Venture,

Franmar received certain income and incurred certain direct costs.

39.   Franmar received the following income on behalf of the Joint Venture,

which is evidenced by transfer notes, and not disputed by the parties:

a.     $1,970,000.00 from TXI as the purchase price of the crushing plant
received on March 22, 2001 (Ex 1021).

b.     $330,000.00 from TXI as a construction contract installment payment
received on May 22, 2001 (Ex. 1020).

c.     $330,000.00 from TXI as a construction contract installment payment
received on September 24, 2001 (Ex. 1020).

d.     $200,000.00 from TXI as construction contract installment payment
received on December 5, 2001 (Ex. 1020).

e.     $238,750.00 from TXI as a construction contract installment payment
received on January 8, 2002 (Ex. 1020).

f.     $9,300.00 from TXI as a construction contract installment payment
received on March 17, 2002 (Ex. 1020).

g.     $195,146.36 from TXI as a construction contract final installment
payment received on May 21, 2002. (Ex. 1020).

40.   Franmar received no other income on behalf of the Joint Venture.  Franmar's

total income on behalf of the Joint Venture therefore totaled $3,273,196.36.

**Findings of Fact and Conclusions of Law - 11**

41.   Franmar also incurred certain direct costs for his part in the Joint Venture.

42.   Wheaton does not dispute that Franmar incurred costs totaling

$2,472,443.72 as follows:

   a.   $1,650,000.00 for the purchase of crushing plant from the Mine.
        (Docket No. 130, Ex. A to Wheaton's Closing Argument).

   b.   $822,443.72 as direct costs of the turnkey operation.  (Docket No.
        130, Exs. A and B to Wheaton's Closing Argument).

43.   Wheaton initially agreed to only $755,424.72 in direct costs of the turnkey

operation.  However, the Court allowed Franmar to supplement the record

post-trial in order to submit evidence supporting its claims for such costs.

Based on those submissions (Docket No. 127), Wheaton agreed to the

$822,443.72 in costs related to the turnkey operation.

44.   Franmar, however, claims additional direct expenses, which Wheaton

contends are not supported by the evidence.  Franmar supports its claims

with copies of check stubs and copies of wire transfers and/or invoices.

However, none of these documents indicate how the claims are related to the

turnkey operation.

45.   Mr. Tolbert testified that he knows they are related to the turnkey operation

because they are dated during the time period of the turnkey operation.  Mr.

Tolbert testified that Franmar was doing very little, if any, other business

during this time period, and therefore it is clear that the costs relate to the turnkey operation.

46.     The Court finds that there is insufficient evidence to support Franmar's claims for these additional costs.  The costs are of the type typically supported by documents that would specifically tie them to the turnkey operation.  Franmar's failure to produce such documents is fatal to his claims.

47.     The Court finds one exception to this general finding - the Grove crane.  As noted above, the Joint Venture purchased a Link Belt Crane from the Mine.  The purchase agreement between TXI and Franmar required Franmar to provide TXI with either the Link Belt Crane or a substitute Grove crane.  (Ex. 1034).  TXI chose the Grove crane, which was purchased by Franmar at a price of $77,500.00.  (Ex. 1031, document 118).  The cost of the Grove crane was therefore a direct cost to Franmar on behalf of the Joint Venture.

48.     The addition of the expense for the Grove crane brings Franmar's total direct costs to $2,549,943.72  ($2,472,443.72 for purchase price of crushing plant and costs related to turnkey operation, plus $77,500.00 for purchase price of the Grove crane).

49.     Franmar's net profit on behalf of the Joint Venture is therefore $723,252.64

**Findings of Fact and Conclusions of Law - 13**

($3,273,196.36 total income minus $2,549,943.72 total direct costs).

**I.      Wheaton's Obligations**

50.   As noted above, Wheaton was responsible for reselling the excess

equipment, buildings and their contents.  With respect to Wheaton's

obligations, Wheaton also received income and incurred direct costs related

to the Joint Venture.

**J.      Wheaton's Net Profit Under the $45,000.00 Transaction**

51.   With respect to the $45,000.00 transaction, which the Court already

determined was part of the Joint Venture, Wheaton incurred a $45,000.00

expense by paying the Mine for the equipment.  (Ex. 1024).

52.   Wheaton received $86,130.19 for the sale of those items.  (See Ex. 2140 -

the parties stipulated to the accuracy of the sales price for the items listed

under the $45,000.00 transaction).

53.   Wheaton also received $3,066.25 form American Association of Auctioneers

for the sale of miscellaneous items.  Wheaton does not dispute that it

received this income from the sale of miscellaneous items purchased under

the $45,000.00 contract.  Instead, Wheaton contends that it is not attributable

to the Joint Venture based on its argument that the entire $45,000.00

contract is not part of the Joint Venture.  Given the Court's determination

**Findings of Fact and Conclusions of Law - 14**

that the $45,000.00 transaction is part of the Joint Venture, the Court finds

that Wheaton received the additional $3,066.25 on behalf of the Joint

Venture.

54.     Accordingly, Wheaton's net profit under the $45,000.00 transaction is

$44,196.44 ($86,130.19 for the sale of the bulk of the items purchased under

the contract, plus $3,066.25 form American Association of Auctioneers for

the sale of miscellaneous items, minus $45,000.00 as the purchase price).

**K.     Wheaton's Net Loss Under the $100,000.00 Purchase Agreement**

55.     With respect to the purchase of the Link Belt Crane and buildings, Wheaton

incurred the following costs, which are not disputed by the parties:

a.      $100,000.00 purchase price. (Ex. 1002)

b.      $95,000.00 cost of removal of the Maintenance Shop Building. (Exs.

1012 and 1030).

56.     Wheaton also claims that he incurred $10,000.00 in costs for removal of the

contents of the buildings.  Wheaton claims that he hired several individuals

and trucks to haul the contents to his equipment yard.  However, Wheaton

failed to provide any documents supporting his costs.  Although it is

possible that Wheaton did incur costs for removing the contents, without

documentation, Wheaton cannot recover those costs.  Like the

undocumented costs claimed by Franmar for the turnkey operation, these

costs are the type typically supported by documents that could specifically

tie them to the Joint Venture.  Wheaton's failure to produce such documents

is fatal to his claim.

57.   Accordingly, the Court finds that Wheaton incurred $195,000.00 in costs

related to the $100,000.00 purchase agreement.

58.   Wheaton received the following undisputed income from the items

purchased under the $100,000.00 purchase agreement:

a.   $128,250.00 for the sale of the Link Belt Crane. (Ex. 2090).

b.   $5,000.00 for the sale of the Administration Building. (Ex. 2075).

c.   $4,355.00 for the sale of scrap iron to Pacific Recycling (Ex. 2032).

d.   At least $9,652.00 for the sale of items from the Shop/Warehouse

Building sold to American Association of Auctioneers and payment

from Western Construction, Inc. (Exs. 1015 and 2088).

59.   The discrepancy in Wheaton's income related to the $100,000.00 purchase

agreement comes from the value of the contents of the Shop/Warehouse

Building.  Wheaton claims that the value of those contents, and the only

income he received for them, is the $9,652.00 listed above.

60.   Franmar contends that the contents were worth $150,000.00, based on Mr.

**Findings of Fact and Conclusions of Law - 16**

Tolbert's testimony that Mr. Woods told him the contents were worth $150,000.00.  However, at trial, Mr. Woods testified that he does not recall telling Mr. Tolbert that the contents were worth $150,000.00, and he does not believe the contents were worth that much.

61. The Court finds Mr. Woods' testimony reliable.  As an uninterested party, who was subpoenaed to testify by Wheaton, the Court finds that Mr. Woods had no reason to give false testimony.

62. Moreover, Franmar failed to present any evidence that the contents were worth $150,000.00, other than his own belief.  The Court therefore finds that the contents were worth what they sold for, $9,652.00, as evidenced by sales receipts.  (Exs. 1015 and 2088).

63. Accordingly, Wheaton received income related to the $100,000.00 purchase agreement totaling $147,257.00.

64. Wheaton's net loss under the $100,000.00 purchase agreement is therefore $47,743.00 ($147,257.00 in income received from the sale of the purchased items less the $195,000.00 incurred in the purchase price and the removal of the Maintenance Shop Building).

**L. Wheaton's Net Profit for Other Miscellaneous Sales and Obligations**

65. TXI did not want certain equipment purchased along with the crushing plant.

**Findings of Fact and Conclusions of Law - 17**

The Joint Venture tasked Wheaton with selling those items which are summarized hereafter.

**Lime Silo**

66.   It is undisputed that Wheaton sold a Lime Silo for $7,500 which had been purchased as part of the crushing plant.  (Ex. 1006).  Wheaton claims no costs associated with that sale.

**Radial Stacker**

67.   Wheaton also sold a Radial Stacker for $167,000.00 that was acquired along with the crushing plant. (Exs. 1007 and 2091).

68.   Wheaton claims that it reimbursed itself for direct costs associated with the sale of the radial stacker in the amount of $39,802.38, then distributed $63,598.81 to each party as their equal share of the profit.

69.   Franmar acknowledges receiving $63,598.81, but contends that he was promised, but never received, the remainder of his half of the profits. Franmar claims that Wheaton did not incur costs in the sale of the radial stacker, and therefore Franmar should have received $83,500.00, half of the total $167,000.00 sales price.

70.   Although Wheaton claims that it incurred costs in selling the Radial Stacker, Wheaton produced no documentation supporting those costs.  Like the

undocumented costs allegedly incurred by Franmar for the turnkey operation and allegedly incurred by Wheaton for removal of items from the Mine, costs associated with the sale of the Radial Stacker should also be easily documented.  Without such documentation, Wheaton cannot recover for his costs.  Wheaton was therefore required to pay Franmar half of the total sales price.

71.   Wheaton therefore should have paid Franmar $83,500.00 instead of $63,598.81.

72.   That means that at this point, after distributing $63,598.81 to each party, Wheaton still retains $39,802.38 in net profit on behalf of the Joint Venture for the sale of the Radial Stacker.

**Grasshoppers and Field Conveyor**

73.   After acquiring the crusher plant and related equipment from Franmar, TXI determined that it did not want some grasshoppers and field conveyors.  TXI sold these items back to the Joint Venture and Wheaton was tasked with reselling them.

74.   Wheaton sold the grasshoppers and field conveyors for $88,200.00. (Ex. 1009).

75.   Wheaton then wired Franmar $73,850.00 as reimbursement for Franmar's

cost of purchasing the items back from TXI, plus Franmar's portion of the profit.

76.   Wheaton now claims that it should receive a portion of that payment back because Franmar did not produce evidence supporting his costs for purchasing the items back from TXI.  The Court disagrees.

77.   Both parties agree that TXI initially obtained the grasshoppers and conveyors as part of the crushing plant deal.  The parties also agree that when TXI determined that they did not want the items, Franmar purchased them back from TXI.  Apparently, Wheaton also agreed, at least initially, to the cost claimed by Franmar for the purchase of the items.  That is why Wheaton wired Franmar $73,850.00.

78.   The Court finds that this is sufficient evidence to support Franmar's claim for the cost incurred in purchasing the grasshoppers and conveyors. Wheaton's dispute of Franmar's cost at this time, years after Wheaton already agreed to and paid Franmar for his cost, is unconvincing.

79.   The Court therefore finds that neither party is owed anything from the other party regarding the grasshoppers and conveyors.

**Engine Lifting Device**

80.   The parties agreed and stipulated that Wheaton sold an engine lifting device

**Findings of Fact and Conclusions of Law - 20**

for $500.00, and that it is part of the Joint Venture. (Ex. 2068).

## Power Hack Saw, Pipe System, and Filter Crusher

81.   The parties agreed and stipulated that Wheaton sold a power hack saw, pipe

system and filter crusher for $1,000.00, and that they are part of the Joint

Venture. (Ex. 2078).

## Mine Site Cleanup Costs

82.   The parties agreed and stipulated that Wheaton incurred $20,583.60 in Mine

cleanup costs on behalf of the Joint Venture.

## Property Taxes

83.   Wheaton paid property taxes at the Mine on behalf of the Joint Venture.

Wheaton produced receipts for paying those taxes in the amount of $180.44.

## Wheaton's Net Profit for Miscellaneous Items

84.   Wheaton's net profit for miscellaneous items on behalf of the Joint Venture

is therefore $28,038.34. ($7,500.00 for the lime silo, plus $39,802.38 for the

remaining radial stacker profit, plus $500.00 for the engine lifting device,

plus $1,000.00 for the power hack saw, pipe system and filter crusher, minus

$20,583.60 in Mine cleanup costs, minus $180.44 in taxes).

## M.   Wheaton's Net Profit Overall

85.   Wheaton' total net profit on behalf of the Joint Venture is therefore

**Findings of Fact and Conclusions of Law - 21**

$24,491.78 ($44,196.44 for profit on the $45,000.00 transaction, minus $47,743.00 loss on the $100K purchase agreement, plus $28,038.34 profit on the miscellaneous items).

**N.    Final Accounting**

86.    As noted above, Franmar received a net profit of $723,252.64 on behalf of the Joint Venture.

87.    The Court will subtract $42,880.00 from that total for the adjusted commission on the trucks/bulldozer deal the parties agreed Franmar would receive from the Joint Venture.  That brings Franmar's total net profit on behalf of the Joint Venture to $680,372.64.

88.    As noted above, Wheaton received a net profit of $24,491.78 on behalf of the Joint Venture.

89.    Under the terms of the Joint Venture, each party owed the other party half of their net profit.  Franmar therefore owes Wheaton $340,186.32, and Wheaton owes Franmar $12,245.89.

## CONCLUSIONS OF LAW

**A.    Joint Venture Formation**

1.    "A joint venture is analogous to a partnership and is defined as an association of two or more persons to carry out a single enterprise for

profit." *See Saint Alphonsus Reg'l Med. Ctr., Inc. v. Krueger*, 861 P.2d 71, 77 (Idaho Ct. App. 1992).

2.    A joint venture "may be express or implied by conduct; however, the intent of the parties controls." *Id.*

3.    "To constitute a joint adventure the parties may combine their property, money, efforts, skill or knowledge in some common undertaking, and their contribution in this respect need not be equal or of the same character, but there must be some contribution by each joint adventurer of something promotive of the enterprise." *See Rhodes v. Sunshine Min Co.*, 742 P.2d 417, 421 (Idaho 1987). When property is acquired by the joint venture, it is immaterial in whose name the property is acquired because one holding title to the property is a trustee for those engaged in the joint enterprise. *Id.*

4.    Whether a joint venture exists is primarily a question of fact for the trial court. *Id.*

5.    The Court concludes that based on both the express and implied conduct of the parties, Wheaton and Franmar created a Joint Venture. Although there was no written agreement, the sole shareholders of each company, Mr. Wheaton on behalf of Wheaton, and Mr. Tolbert on behalf of Franmar, specifically discussed and agreed to form the Joint Venture for the express

purpose of obtaining a profit.

6.     The Court finds, however, that neither Mr. Wheaton nor Mr. Tolbert were

parties to the Joint Venture.  Although the parties did not specifically

address whether the Joint Venture included only the two corporations, the

two individuals, or some combination thereof, the parties conduct reveals

that they intended to form a Joint Venture between the two corporations.

The contracts, purchase agreements, etc. that made up the transactions

associated with the Joint Venture involved only the two corporations, not

Mr. Wheaton or Mr. Tolbert, revealing that Mr. Wheaton and Mr. Tolbert

were not parties to the Joint Venture.

**B.     Costs Attributable to Joint Venture**

7.     As noted above, the parties did not execute a written agreement creating the

Joint Venture.  Instead, Mr. Wheaton, on behalf of Wheaton, and Mr.

Tolbert, on behalf of Franmar, orally formed the Joint Venture.

8.     Based on testimony given at trial, the only issues specifically agreed to

during formation of the Joint Venture were their purpose in forming it, the

basic duties of each party, and the division of profits.

9.     The purpose for forming the Joint Venture was primarily to purchase the

crushing plant from the Mine and resell it to TXI.

**Findings of Fact and Conclusions of Law - 24**

10.   The duties under the Joint Venture were divided between Franmar and Wheaton.  Franmar was responsible for the tear-down, transportation, and reassembly of the crushing plant on a turnkey basis at TXI's facility in Oklahoma, and Wheaton was responsible for the removal and resale of all the remaining equipment, buildings, and contents of the buildings located at the Mine.

11.   The parties agreed to split the net profits equally between Wheaton and Franmar.

12.   However, the parties failed to specifically discuss what costs would be attributable to the Joint Venture.  As discussed in the Findings of Fact above, Mr. Wheaton testified that he had never included general overhead expenses as costs attributable to a joint venture, and Mr. Tolbert testified that he did not consider general administrative expenses as part of the joint venture until his accountant informed him to do so.

13.   There exists no Idaho case law directly addressing whether a party to a joint venture may attribute general overhead expenses to a joint venture.

14.   However, Idaho courts have defined a joint venture as analogous to a partnership for a single transaction.  *See Saint Alphonsus Reg'l Med. Ctr., Inc.*, 861 P.2d at 77.  Unlike a general partnership, in which all expenses

incurred by one partner affects the other partners, in a joint venture, only the expenses incurred with respect to the particular project affect the other partner. The reasonable conclusion, therefore, is that only expenses incurred with respect to that single transaction may be charged to the joint venture.[3]

15.    Additionally, the general rule followed by other jurisdictions is that a party in a joint venture may not charge the joint venture for general overhead expenses. *See Commercial Metals Co. v. Pan Am. Trade & Inv. Corp.*, 163 A.2d 264, 268 (Del. 1960).

16.    Finally, in Idaho, the general rule in other types of contracts, such as 'cost plus' construction contracts, "is that overhead is not included within the term 'costs' unless the contract so specifies." *Freeman & Co. V. A1 Bolt*, 968 P.2d 247, 251 (Idaho Ct. App. 1998).

17.    The *Freeman* court cited the following language from 13 Am.Jur.2d, Building and Construction Contracts § 20 (1964 & Supp.1998) as support for the general rule:

     a.     Under a "cost plus" contract the contractor is entitled to recover his costs plus the agreed percentage. A question arises under these

---

[3] In an unpublished opinion, the Fourth Circuit of Appeals made this same analogy in *Precon Corporation v. G&B Environmental, Inc.*, 103 F.3d 119, 1996 WL 694440 (4th Cir. 1996). The opinion is not cited here as authority or precedent. However, given that Idaho Court's have made a similar analogy, the opinion is supportive of this Court's conclusion.

**Findings of Fact and Conclusions of Law - 26**

contracts as to what is included in the costs.  It has been held that the contractor is not entitled, in addition to the percentage called for in the contract, to charge for his general or overhead expenses, such as salaries, telephone service and office supplies, for his own time in superintending the work, for carefare for laborers, for the cost of extra work not called for by the original contract and commissions thereon, or for the cost of doing over the work that was not properly done.  On the other hand, he is entitled to charge for materials, and supplies furnished, for the wages of workmen, for the salaries of superintendents, and for accident and indemnity insurance.

18.   Given the fact that the parties to the Joint Venture in this case did not specifically agree that general overhead expenses would be included as Joint Venture expenses, particularly Mr. Tolbert's testimony that he had no idea that administrative and overhead expenses would be included until his account informed him otherwise, the Court finds that the general rule followed in other jurisdictions and for other types of contracts in Idaho should apply in this case.  Accordingly, general overhead expenses are not attributable to the Joint Venture.

**C.    Causes of Action**

**Findings of Fact and Conclusions of Law - 27**

**Breach of Contract**

19.    Based on the above analysis, the Court concludes that Wheaton breached the

        Joint Venture contract by failing to equally divide the profits it obtained on

        behalf of the Joint Venture with Franmar.

20.    The Court also concludes that Franmar breached the Joint Venture contract

        by failing to equally divide the profits it obtained on behalf of the Joint

        Venture with Wheaton.

**Accounting**

21.    Based on the above analysis, the Court concludes that each party was

        entitled to an accounting of the profits and losses of the Joint Venture from

        the other party.  Each party was likewise entitled to an appropriate

        distribution of the profits and losses of the Joint Venture from the other

        party.  Both parties failed to fulfill their accounting duty.

**D.    Conclusion on Damages**

22.    As noted above, Franmar received a net profit of $680,372.64 on behalf of

        the Joint Venture, and Wheaton received a net profit of $24,491.78 on behalf

        of the Joint Venture.

23.    The Court therefore concludes that, because under the terms of the Joint

        Venture each party owed the other party half of its net profit, Franmar owes

**Findings of Fact and Conclusions of Law - 28**

Wheaton $340,186.32, and Wheaton owes Franmar $12,245.89.

**E.      Attorney Fees**

24.     The Court will not resolve the attorney fees issue at this time so as to allow

the parties to file their petitions for fees in light of this decision.

**F.      Judgment**

25.     The Court will issue a separate Judgment as required by Federal Rule of

Civil Procedure 58.



DATED:  **March 9, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court